Case No. HI-22-1191

# UNITED STATES BANKRUPTCY APPELLATE PANEL
# FOR THE NINTH CIRCUIT

On appeal from:
United States Bankruptcy Court, District of Hawaii
Bankr. Case No. 21-00094
Adv. Proc. No. 21-90009

---

In re
PACIFIC LINKS U.S. HOLDINGS, INC.,
Debtor

---

TIANJIN DINGHUI HONGJUN EQUITY INVESTMENT PARTNERSHIP
(LIMITED PARTNERSHIP),
Appellant

v.

PACIFIC LINKS U.S. HOLDINGS, INC.; HAWAII MVCC LLC;
HAWAII MGCW LLC; MDRE LLC; MDRE 2 LLC; MDRE 3 LLC;
MDRE 4 LLC; and MDRE 5 LLC,
Appellees

---

## APPELLANT'S REPLY BRIEF

---

Kenneth H. Brown
Jordan A. Kroop
Cia H. Mackle
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street
34th Floor, Suite 3430
San Francisco CA 94104
Telephone: (415) 263-7000
Email: kbrown@pszjlaw.com
jkroop@pszjlaw.com
cmackle@pszjlaw.com
*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

**I.**     **INTRODUCTION** ....................................................................**1**

**II.**    **DISCUSSION** ........................................................................**3**

      **A.**     Appellees' Financial Condition on the Closing Date.......................**3**

      **B.**     Good Faith Defense ................................................................**12**

           **1.**     Good Faith ........................................................................**12**

           **2.**     Value Given ......................................................................**17**

**III.**    **CONCLUSION** ....................................................................**19**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Hayes v. Palm Seedlings Partners-A*
  *(In re Agric. Research & Tech. Grp., Inc.),*
  916 F.2d 528 (9th Cir. 1990) ................................................................................17

*Howard v. Family Dollar Store #5006,*
  914 So. 2d 118 (La. App. 2d Cir. 2005) ..............................................................11

*In re Schleier,*
  290 B.R. 45 (Bankr. S.D.N.Y. 2003) ....................................................................1

*Magana v. Northern Mariana Islands,*
  107 F.3d 1436 (9th Cir. 1997) ..............................................................................7

*Rainsdon v. Gearheart (In re Ford),*
  2021 Bankr. LEXIS 13, *29 (Bankr. D. Idaho, January 6. 2021) ......................12

*Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.,*
  475 F.Supp. 693 (D. Nev. 1978) ..........................................................................12

## OTHER AUTHORITIES

Marlene Dietrich, *Marlene Dietrich's ABC's: Wit, Wisdom, and Recipes,* University Press of
  Kentucky (2022), at 120 ........................................................................................1

## I.     INTRODUCTION

Timing is everything.

Timing is the "alpha and omega of aerialists, jugglers, actors, diplomats, publicists, generals, prizefights, revolutionists, financiers, dictators, lovers"[1] and, surely, bankruptcy courts. A bankruptcy petition filed even minutes before a foreclosure sale will automatically stay and invalidate that sale.[2] What might a bankruptcy court do if the foreclosure sale were held "sometime in Q3 or Q4" and the petition filed sometime before January 2020?

Appellees are unable in their *Answering Brief*[3] to point this Court to *any* evidence *precisely* establishing what did or did not occur, what parties believed or did not yet believe, before or on the Closing Date.[4] Things happening "around" the Closing Date or, worse, *after* the Closing Date, are equally non-probative of essential elements of Appellees' fraudulent transfer claims against Appellant. Yet Appellees failed to elicit from their witnesses and failed to present to the Bankruptcy Court evidence *precisely* establishing the timing of critical events. And the Bankruptcy Court clearly erred when it drew unwarranted inferences from vague testimony about the timing of what

---

[1] Marlene Dietrich, *Marlene Dietrich's ABC's: Wit, Wisdom, and Recipes,* University Press of Kentucky (2022), at 120.

[2] *In re Schleier*, 290 B.R. 45 (Bankr. S.D.N.Y. 2003) (foreclosure sale occurring at 9:15 a.m. void following debtor's (constructive) bankruptcy filing at 9:05 a.m.).

[3] *Appellees' Answering Brief* [Doc. 25-1] ("**Answering Brief**").

[4] Undefined capitalized terms used in this Reply Brief retain the meanings given to them in Appellant's *Amended Opening Brief* [Doc. 21-1] ("**Opening Brief**").

happened exactly when and, significantly, what did these parties know at precise times before, on, or only after the Closing Date. Appellees' witnesses' testimony exuded an utter lack of precision on indispensable elements of Appellees' fraudulent transfer case. Regrettably, the Bankruptcy Court erroneously inferred precision without supporting evidence and made key elemental findings of fact, leading to a conclusion of Appellant's liability, regarding the cessation of equity infusions, Appellees' expectations of future infusions, and Appellants' lack of adequate capitalization. In doing so, the Bankruptcy Court found facts in the absence of sufficiently-detailed timing evidence and clearly erred by inferring precision amidst objective vagueness. To avoid clear error, the Bankruptcy Court should have considered more carefully what the trial evidence did and did not establish regarding the precise timing of matters pertaining directly to Appellees' financial condition *before and on the Closing Date*. Because the Bankruptcy Court did not, this Court must reverse.

This Court must also reverse the Bankruptcy Court because it ignored ample evidence of Appellant's good faith in connection with the defense under Bankruptcy Code § 548(c) and its Hawaii analogue. Appellees again failed in their Answering Brief to identify for this Court any evidence that Appellant knew or should have known *on the Closing Date* that equity infusions by Appellees' Asian affiliates would but cut off, putting Appellees in financial distress. What Appellant or anyone else knew about Appellees' financial condition *after* the Closing Date is irrelevant to Appellant's good faith defense. Timing matters. The trial evidence demonstrates that Appellant did not

know and had no way of knowing that the historic pattern of equity infusions would cease (and that COVID-19 was looming just a few months away) *on the Closing Date*, yet the Bankruptcy Court made findings in this regard without evidence. The Bankruptcy Court clearly erred and its Judgment in this respect should be reversed as well.

Additionally, this Court should remand this matter to the Bankruptcy Court so that a different lack of precision—no findings regarding value given in connection with the good faith defense—may be remedied.

## II.   DISCUSSION

### A.   Appellees' Financial Condition on the Closing Date

This Court must reverse the Judgment if the Bankruptcy Court's "Equity Cessation Findings" were clearly erroneous. If trial evidence did not then and cannot now establish that Appellees, *on or before the Closing Date*, believed that equity infusions from Asia would cease or fail to cover Appellees' liabilities as they came due, then the Bankruptcy Court's conclusions—that (a) Appellees had unreasonably small capital *on the Closing Date* and (b) Appellees knew they could not pay debts when due *on the Closing Date*—must be clearly erroneous and the Judgment must be reversed.

Appellees argue in their Answering Brief that evidence in the record establishes that "discussions concerning halting development and withholding equity infusions occurred before the closing date of the 2019 Transaction." But "discussions" about either topic with only vague references to *when* those discussions occurred do not meet Appellees' burden. The applicable insolvency tests require a consequent reasonable

belief that the equity infusions would cease or otherwise fail to cover Appellees' incurred liabilities as they came due. And a discussion concerning a temporary halt to the development proves nothing unless accompanied by evidence that the pause was permanent and would result in Appellees' inability to pay their incurred liabilities.

Appellees cannot identify any testimony or a single document proving they were told *before the Closing Date* that equity infusions from the Asian Affiliates would cease.[5] Appellant here responds to every single piece of evidence Appellees cite in their Answering Brief:

> In 2019 and 2020, Appellees, collectively, did not generate cash flow sufficient to pay their debts.[6]

Appellant does not dispute this, but it is not probative of whether Appellees did or did not on the Closing Date reasonably anticipate future equity infusions. Appellees do not dispute that anticipated equity infusions must be considered in assessing capital adequacy and ability to pay debts as they become due.

> Historically, PLUSH relied on equity infusions, which were booked as additional paid in capital, to fund the operating shortfalls of Appellees.[7]

Appellant does not dispute this, but it likewise is not probative of whether Appellees did or did not on the Closing Date reasonably anticipate future equity infusions.

---

[5] Appellees spill considerable ink identifying undisputed and irrelevant evidence that their business failed *after the transaction closed*. OK, but it's irrelevant to what the parties believed on the Closing Date that only *after* the Closing Date did Appellees decide to temporarily halt the project, the COVID pandemic strike unexpectedly, and the temporary halt become permanent.

[6] Answering Brief at 8.

[7] Answering Brief at 8.

> Appellees' October, November, and December 4 and 9, 2019 90- day forecasts projected very significant revenue shortfalls ($2 million, $1.3 million, and $4.12 million, $3.65 million) …[8]

Appellant does not dispute this, but it, too, is not probative of whether Appellees did or did not on the Closing Date reasonably anticipate future equity infusions.

> Appellees understood through discussions with Vivien Zhang that equity infusions would not be made in amounts sufficient to cover the shortfalls.[9]

Testimony regarding these "discussions" never stated *precisely when* Appellees gained this understanding. As set forth in greater detail in Appellant's Opening Brief at 21–22, "would not be made in amounts sufficient to cover shortfalls" does not establish the magnitude of the insufficiency or which shortfalls would go uncovered or by how much. The lack of precision is not simply a shortcoming of Chang's testimony; it fails to carry Appellees' burden.

> [T]hese revenue shortfalls were not funded.[10]

Appellant does not dispute that these shortfalls were not ultimately funded (at least entirely), but that is still not probative of whether Appellees did or did not *on the Closing Date* reasonably anticipate future equity infusions.

---

[8] Answering Brief at 8.

[9] Answering Brief at 8–9.

[10] Answering Brief at 9.

> By the third quarter of 2019, the equity infusions were progressively smaller and less than requested, and in the fourth quarter of 2019 Vivien said that no further funding would be forthcoming.[11]

Not only are unquantified, incremental reductions in equity infusions not probative of whether Appellees did or did not *on the Closing Date* reasonably anticipate future equity infusions, "in the fourth quarter" does not specify precisely when—before or during the three weeks after the Closing Date—Vivien purportedly informed Appellees of a full funding cessation. Additionally, Appellees misrepresent Chang's testimony by stating that Chang knew in October 2019 that capital infusions were slowing and would ultimately cease. At most, Chang's testimony establishes that, in October 2019, infusions "were slowing down and, you know, … coming in much lower and smaller amounts," which is not probative of whether Appellees reasonably anticipated *on the Closing Date* that equity infusions would cease entirely or otherwise fail to cover Appellees' liabilities. The remainder of Chang's quoted testimony refers to "Q4"—not October—and does nothing to establish timing within Q4: was it October 1 or sometime during the three weeks between the Closing Date and the end of Q4? Based on this testimony, no one knows. Certainly, the Bankruptcy Court could not have known.

---

[11] Answering Brief at 9.

> In or about the third or fourth quarter of 2019, Appellees decided that the development of the Makaha Project would have to be halted due to lack of sufficient cash flow.[12]

Again, the lack of precise timing missing from this statement is fatal to Appellees' burden. When, precisely, within the date range of "third or fourth quarter" did Appellees make this decision? It could have been anytime between July 1 and December 31. Because it could have been during the three weeks between the Closing Date and the end of the "fourth quarter," the evidence does not establish when the statement was made with the requisite precision to meet Appellees' burden. The trial evidence was unclear and the Bankruptcy Court had no evidentiary basis for concluding that this decision necessarily occurred before the Closing Date. Moreover, the decision to temporarily halt development does not equate to a halt in sufficient equity infusions to cover liabilities already incurred. Halting future operations and paying incurred liabilities are hardly the same. There is a critical difference between having sufficient funds to pay for already-incurred expenses and having sufficient funds to continue developing a high-end real estate development.[13]

---

[12] Answering Brief at 9.

[13] Appellees' assertion that they knew on the Closing Date that equity infusions would cease because they had decided to temporarily halt development in October is a "classic non sequitur and commits the fallacy of the consequent because the suggested conclusion does not follow logically from given premises or any antecedent statement." *Magana v. Northern Mariana Islands,* 107 F.3d 1436, 1443 (9th Cir. 1997). It's clear error.

> On October 15, 2019, Appellees listed their real properties for sale with a broker for $35 million USD.[14]

A decision to list the project for sale does not imply that equity infusions would not be provided to cover incurred liabilities. It belies common sense to believe one has anything to do with the other. Listing the project for sale in October not only is not probative of whether equity infusions would contemporaneously cease, but it doesn't even suggest there was a plan to terminate development. Overwhelming documentary evidence makes clear that the October "Phase 1" listing was a "Joint Venture" opportunity, whereas "Phase 2" (if a JV partner didn't present itself), occuring in 2020, was an "Outright Sale."[15]

> At the time of the October 15, 2019 listing of the real properties for sale, (i) there was significant political pressure in China controlling the outflow of funds from China on certain investments; and (ii) Appellees anticipated difficulty in being able to receive funding from China; (iii) the difficulty in directing money outside of China resulted in Appellees engaging a real estate broker … The primary source of revenue for equity infusions to Appellees is generated in mainland China.[16]

Appellant does not dispute this. In fact, these are the circumstances that necessitated the 2019 Transaction, including Appellant's forbearance on the Initial Loan. The political impediments to the outflow of funds from China indicates a liquidity-timing

---

[14] Answering Brief at 9.

[15] App'x Z (D-78) at PLUSH APPX. 0527-28 (describing the two different proposed phases); Supp. App'x 45 (D-85) (discussing "shift[] from a JV approach to an outright sale" on January 16, 2020); App'x 21 (D-22) (discussing that the October CBRE engagement was to "approach potential JV partners"). The Bankruptcy Court clearly erred by ignoring the details contained in this uncontroverted documentary evidence.

[16] Answering Brief at 9–10.

problem, not insolvency. If the Bankruptcy Court equated cash-flow timing needs with insolvency, it clearly erred. Moreover, this is not probative of whether Appellees did or did not *on the Closing Date* reasonably anticipate future equity infusions.

> Prior to the 2019 Transaction, Appellees were … not able to pay their debts as they came due, including a golf course design fee of $1,000,000, of which Appellees were only able to pay $500,000 in November of 2019.[17]

This typifies the mischaracterizations of the evidence scattered throughout the Answering Brief. The record reflects that, on or before November 19, 2020, TGR *consensually agreed* to be paid in two installments (the first on November 20, 2019, and the second on January 15, 2020), rather than the single payment on December 1, 2019, as initially contemplated.[18] That Appellees did not make the second installment in 2020 had nothing to do with whether they were able to pay debts on the Closing Date weeks earlier. Further, *after the Closing Date*, Appellees still received equity infusions well in excess of the remaining $500,000 owing to TGR.[19]

Appellees have not identified a single piece of evidence establishing that the parties understood or expected equity infusions to stop or otherwise fail to cover Appellees' incurred liabilities as they came due *before the Closing Date*, because such evidence does not exist. The Bankruptcy Court only received testimony that certain

---

[17] Answering Brief at 10.

[18] Supp. App'x 46 (P-43); Supp. App'x 47 (P-44).

[19] App. 22 and 23. A bankruptcy court can surely appreciate that companies frequently and unremarkably manage payables.

conversations regarding the possibility of a cessation in equity infusions occurring sometime in Q4 2019. With no clear evidence of whether and precisely when relative to the Closing Date equity infusions would stop or be reduced, Appellees could not have met their burden of proof. The Bankruptcy Court clearly erred by finding that Appellees did.

It was Appellees' burden to prove their insolvency (under any applicable test) as of the Closing Date. Yet in pages and pages of written testimony and days of trial testimony, Appellees *never* produced a single statement meeting their burden of establishing that *by December 11, 2019* (the Closing Date), they had sufficient reason to expect equity infusions to cease or fall short of covering incurred liabilities.[20] Given the available evidence, Appellees did not meet and could not have met their burden. The Bankruptcy Court clearly erred by finding that they did.

Appellees attempt to justify their failure to meet their burden of proof by characterizing their failure as an ambiguity for which there are "two permissible views." Ostensibly, Appellees believe that, by their offering evidence of a conversation in "Q4," the Bankruptcy Court could determine that Appellees met their burden to prove that the conversation (and understanding that resulted from it) occurred before December

---

[20] A simple follow-up question at trial might have provided that evidence. The written direct testimony might have included the terms "before the Closing Date" rather than relying on some oblique inference to the fourth quarter of 2019. Testimony that Appellees expected a prospective cessation of equity infusions "in Q4" was simply not enough to meet their burden, just as testimony that in October they anticipated an unquantified reduction in equity infusions (for which the magnitude was never established) was likewise not enough to meet their burden.

11, 2019, because that is one of two permissible ways to view the "Q4" reference. Surely, this Court knows better.

The "two permissible views" standard does not obviate the need for the party with the burden of proof to adduce evidence that its version of events *occurred* rather than was simply possible:

> However, "two permissible views of the evidence" did not exist here, because although the trial court may have based its judgment on Howard's testimony, giving it greater credibility, that same testimony failed to give any indication as to the period of time that the spill had been on the floor. He simply testified that the blue liquid was leaking from beneath a stack of boxes. Howard bore the burden of proof on this crucial issue, but he failed to prove the fact that Family Dollar had either actual or constructive notice of the spill. … Howard did not produce any witnesses to verify that the period of time the spill existed, nor did he present any physical evidence, other than the size, to indicate that the spill had existed for any period of time.[21]

Here, Appellants never introduced evidence placing the purported conversation about a funding halt at a precise point in time where whether that conversation occurred before or after the Closing Date was crucial to a central element of all of Appellants' causes of action. That was their burden and they didn't meet it. The Bankruptcy Court clearly erred when it found otherwise.

---

[21] *Howard v. Family Dollar Store #5006*, 914 So. 2d 118, 122 (La. App. 2d Cir. 2005).

### B. Good Faith Defense

#### 1. Good Faith

Appellees argue that the Bankruptcy Court's conclusion that Appellant lacked good faith—a conclusion the Bankruptcy Court only supported with the clearly erroneous finding that Appellant relied "solely" on Du Sha's statements[22]—need not be disturbed if that conclusion is supported by the entire record.[23] It isn't.

The crucial question for purposes of the § 548(c) defense is whether Appellant knew or should have known on the Closing Date that Appellees were inadequately capitalized or could not pay their debts because equity infusions from Asian affiliates were definitely going to stop. Appellees have identified no evidence that Appellant knew this. Instead, Appellees ask this Court to only focus on what Appellant should somehow have known about Appellees' generally poor financial condition,[24] blithely

---

[22] Appellant's Opening Brief (at 25–26) describes Appellant's considerable diligence beyond Du Sha's statements.

[23] Appellees cite two cases (Answering Brief at 31–32) for the proposition that a bankruptcy court may take a holistic view of the evidentiary record to support a finding of lack of good faith under § 548(c). Each should fail to persuade this Court. *Rainsdon* lacked any evidence of the debtor's long history of receiving equity infusions from its affiliates, as is indisputably true here; rather, the debtor there had regularly failed to repay her debts to the transferee. *Rainsdon v. Gearheart (In re Ford),* 2021 Bankr. LEXIS 13, *29 (Bankr. D. Idaho, January 6. 2021). Appellees attempt to use *Wells Fargo Bank v. Desert View Bldg. Supplies, Inc.,* 475 F.Supp. 693 (D. Nev. 1978), to equate the "influence" the transferee exerted over the debtor "to attain an enhanced position as a secured creditor" with the relationship between Appellant and Appellees. They are not remotely equal. As described at p. 16 below, Appellees cite no evidence supporting some vain notion that the relationship between Appellant and Appellees was anything less than arm's-length. The relationship here bears no resemblance to the one prone to "undue influence" in *Desert View Bldg. Supplies.*

[24] Appellees ask this Court to share their skepticism about Appellant's lacking knowledge of Appellees' alleged impecuniousness on the Closing Date by indulging in an "inference" that Appellant "was concerned enough" about future avoidance "that it tried to paper over the problem" with a representation in the loan documents. But there is no bogeyman beneath this bed. Good lawyers are

ignoring the unforeseen impact of the COVID-19 pandemic and that Appellees' fortunes were expected to be bright if their Asian affiliates had continued their historical practice of providing equity infusions until the project's development had advanced to the point where memberships and other sources of operating revenue would become a reality—something that had been Appellees' strategy all along.

Again, Appellees highlight evidentiary facts that Appellees assert support a conclusion that Appellant lacked good faith because it knew or should have known that Appellees were *in extremis* on the Closing Date. Appellant responds here to each assertion to demonstrate that there was no evidentiary support for the Bankruptcy Court's erroneous conclusion that Appellant knew or should have known of Appellee's purported insolvency on the Closing Date:

> (1) Appellee MVCC historically operated at a loss; (2) all the other Appellees did not generate income, but had expenses; (3) all Appellees relied upon capital infusions in order to pay expenses; (4) that Appellees were projecting multi-million dollar budget shortfalls in October, November and December of 2019 …; (5) the Pacific Links Enterprise "was suffering financial setbacks…." around the time of the 2019 Transaction…; (6) that in 2019, Pacific Links owner, Du Sha, contacted Wu Shangzhi of [Appellant], requesting an extension of the 2017 Loan and 2018 Loan, explaining that Pacific Links was short of cash and thus unable to pay back the 2017 and 2018 Loan on time…[25]

These facts explain why the 2019 Transaction was necessary and why Appellant performed its due diligence before proceeding. Appellees were in the middle of a

---

thorough. Appellees' "inference" is as unreasonable as one that supposes auto insurance is only suitable for those who know they will cause an accident.

[25] Answering Brief at 32–33.

massive real estate development. These circumstances were hardly unexpected.[26] Appellant's due diligence *in light of these facts* showed (as discussed in greater detail in the Opening Brief at 25–26): (a) the Asian Affiliates had historically provided ample equity infusions to cover costs of real property ownership and development; (b) Appellees' assets exceeded their liabilities[27] and were more than sufficient to cover their share of the 2019 Loan; and (c) TKB's sale proceeds and profits in 2020, 2021, and 2022 were projected to be substantial.

> (7) that Appellees' assets would be dwarfed by the $56.8 million principal
> joint and several liability [Appellant] obligated each of the Appellees on;[28]

Appellees indulge in a tautology here. Despite that the Bankruptcy Court found Appellees did not meet their burden on balance-sheet insolvency, Appellees attempt to argue that Appellant lacked good faith because it should have known Appellees were balance-sheet insolvent. In refusing to find balance-sheet insolvency, the Bankruptcy

---

[26] Appellees comprise a holding company and single-asset real estate entities whose collective purpose was to develop golf resort properties. Because Appellees' Chinese affiliates had historically financed the development in anticipation of eventual operating and sales revenues once the development was completed, that Appellees were not generating income—even if Appellees proved that Appellant knew all this (they did not)—does not indicate bad faith.

[27] App. 5 (FOF/COL) at 3 ("The financial statements that Plaintiff provided to TDH in connection with the 2019 Loan showed that Plaintiffs' assets exceeded their liabilities, and, while TKB was expected to pay the debt in full, should Plaintiffs and the other guarantors be called on to pay amounts due in the event of TKB's default, Plaintiffs' assets were more than sufficient to cover their share"). The Bankruptcy Court correctly found that Appellees had not met their burden to establish insolvency on a balance-sheet basis. App. 5 (FOF/COL) at 20.

[28] Answering Brief at 33.

Court rejected Appellees' arguments that the entire $57 million of debt should be attributed severally to each Appellee.[29]

> (8) that the Mortgages would prevent Appellees from accessing the equity in their real properties to pay expenses;[30]

This ignores the reality that Appellees never did this and never planned to do this. The development plan always relied on funding from the Asian Affiliates to meet expenses, not a leveraging of Appellees' equity in the first instance. Appellant's loan was intended to assist Appellees with liquidity and timing challenges caused by Chinese political impediments on sending funds out of China. Appellant's obtaining liens on Appellees' assets does not demonstrate lack of good faith because Appellant always reasonably understood that the Asian Affiliates would continue funding Appellees and, in particular, that the 2019 Transaction would affirmatively facilitate the continuance of that funding.

> (9) that there was no new incremental funding provided by the 2019 Transaction, and, thus, no funds could even theoretically be available from the 2019 Loan to fund Appellees' expenses after the 2019 Transaction;[31]

This does not demonstrate lack of good faith because Appellant reasonably expected the Asian Affiliates' funding would continue *because of* the 2019 Transaction and

---

[29] *See* App. 5 (FOF/COL) at 19: Ascribing $57 million of debt to each Appellee's balance sheet "is not realistic … there is no circumstance under which each of the [Appellees] would pay $57 million." Rather, the Bankruptcy Court found it more appropriate to allocate the liability among the Appellees in accordance with each Appellee's net worth. *Id.* at 20. For this reason, Appellees' criticism in footnote 9 of the Answering Brief is perplexing.

[30] Answering Brief at 33.

[31] Answering Brief at 33.

Appellants' forbearance from foreclosure and other remedies for default, which would have doomed the entire Pacific Links enterprise by, among other things, effectively preventing any further funding from the Asian Affiliates.

> (10) that Appellees were becoming obligated, jointly and severally, on almost $56.8 million worth or debt and transferring interest in property as security in amounts of $28,788,800.00 million (based on tax assessed value) in exchange for no direct benefit and nominal, if any, indirect benefit;[32]

Again, note the balance-sheet insolvency tautology described above. This, too, does not demonstrate lack of good faith because Appellant expected the Asian Affiliates' funding would continue *precisely because of* the 2019 Transaction and Appellant's forbearance.

> (11) the transaction between TDH and Appellees was not an arm's length transaction; and (12) TDH used its relationship with TKB to unduly influence Appellees to provide tens of millions of dollars of additional collateral to TDH to effectively secure earlier loans for which Appellees were not liable, making TDH a secured creditor at the expense of Appellees' other creditors.[33]

Appellees have not directed this Court's attention to any evidence in the record that either of these assertions is true. Appellees also fail to explain the basis on which they conclude that the relationship *between TDH and Appellees* was not arm's-length. Appellees appear to conflate (one hopes, not intentionally) Appellant's obviously arm's-length relationship with Appellees with the relationship between *TKB* and Appellees, which certainly was not arm's-length.

---

[32] Answering Brief at 33–34.

[33] Answering Brief at 34.

### 2. Value Given

Because the Court clearly erred by concluding that Appellant did not establish its good faith (*i.e.,* the first prong of the § 548(c) defense) and compounded that error by not making any findings as to the second prong of value given, this Court must remand this case so that the Bankruptcy Court may determine the value[34] Appellant provided. Without doing so, neither this Court nor the Bankruptcy Court can properly assess Appellant's § 548(c) defense.

The Bankruptcy Court undertook no analysis and made no findings of fact regarding the value Appellant gave in the context of the § 548(c) good faith defense. The Bankruptcy Court's only analysis of value given pertained to the issue of reasonably equivalent value for purposes of § 548(a)(1)(B)(i) and its Hawaii correlate. The Bankruptcy Court limited that analysis to determining whether Appellees received value reasonably equivalent to $57 million loan, and rejecting *some* of the testimony of Appellant's trial expert, Hoe.[35] Although the Bankruptcy Court determined that

---

[34] Appellees incorrectly assert the § 548(c) good faith defense requires "reasonably equivalent value." It doesn't. Only *some* value is required. Quoting *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)* more fully than Appellees did:

> Hawaii's adoption of the Uniform Act provides for an "out" to certain transferees who wish to recover the value of property they gave the debtor. Haw. Rev. Stat. § 651C-8(a) permits transferees who received the transfer in good faith and gave reasonably equivalent value to recover any value they exchanged in a transaction avoided under Haw. Rev. Stat. § 651C-4(a)(1). Haw. Rev. Stat. § 651C-8(d) permits transferees who received a transfer in good faith to recover **any** value they gave in a transaction avoided under Haw. Rev. Stat. § 651C-4(a)(2). See also 11 U.S.C. § 548(c)."

916 F.2d 528, 535 (9th Cir. 1990) (emphasis added).

[35] The Bankruptcy Court did not, as Appellees claim, "thoroughly discredit[ ]" Hoe's report. Rather, the Bankruptcy Court quarreled with only two aspects of that report. First, the Bankruptcy Court

Appellees did not receive reasonably equivalent value, it made no determination at all of what value Appellees *did* receive. Appellant respectfully refers this Court to the Opening Brief at 21 and 30–31 for a discussion of: (a) how Appellees received quantifiable value in the form of an extended runway (and that the Bankruptcy Court's reasoning for determining that Hoe's projected sales were overstated and unrealistic was fundamentally flawed); and (b) how Appellees received at least $800,000 in value from the 2019 Transaction in the form of post-closing equity infusions. The Bankruptcy Court illogically rejects Hoe's opinions regarding projected sales because Hoe based those opinions on assumptions that some of those sales would occur after the extended maturity date of the loan and the completion of the development that, only when viewed improperly with perfect hindsight, did not come to fruition. Rather than play Monday-morning quarterback (or, perhaps, post-COVID pundit), the Bankruptcy Court should have acknowledged that, despite Hoe's unforeseeably unrealized assumptions, at least a part of the value Appellees received was the enhanced time, opportunity, and Asian funding to achieve sales and complete development—new life breathed into the Makaha development by Appellant's forbearance and the 2019 Transaction—all as measured, appropriately, on the Closing Date.

---

found that the portion of Hoe's opinion indicating that Appellees received more than $7 million in paid-in capital was unreliable because it was based on incorrect inferences drawn from Appellees' 2020 federal income tax returns. Second, the Bankruptcy Court found that Hoe's opinion incorrectly attributed $74 million of value to projected sales of golf club memberships and net proceeds of residential lots within the Makaha development.

## III. CONCLUSION

For the reasons stated in the Opening Brief and in this Reply Brief, Appellant respectfully requests that this Court reverse the Judgment or, alternatively, vacate the Judgment and remand this case to the Bankruptcy Court for consideration of the remaining elements of Appellant's defense under Bankruptcy Code § 548(c) and for supplemental findings consistent with Bankruptcy Rule 7052.

March 8, 2023

*/s/ Kenneth H. Brown*

Kenneth H. Brown
Jordan A. Kroop
Cia H. Mackle
PACHULSKI STANG ZIEHL & JONES LLP
*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

Under Bankruptcy Rule 8014(a)(10), counsel for Appellant certifies that Appellant's foregoing *Reply Brief* complies with Bankruptcy Rule 8015(a)(7)(A) because it complies with the word limitation set forth in Bankruptcy Rule 8015(a)(7)(B)(ii): excluding those parts listed in Bankruptcy Rule 8015(g) but including headings, footnotes, and quotations, the Reply Brief uses 14-point, proportionally-spaced, serif font and contains 5,009 words, which is below the 6,500-word limit for reply briefs.

March 8, 2023

> */s/ Kenneth H. Brown*
> Kenneth H. Brown
> Jordan A. Kroop
> Cia H. Mackle
> PACHULSKI STANG ZIEHL & JONES LLP
> *Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that on March 8, 2023, I electronically filed the foregoing document with the clerk of the Court for the Bankruptcy Appellate Panel for the Ninth Circuit by using the CM/ECF system.

I certify that all parties of record to this appeal either are registered CM/ECF users, or have registered for electronic notice, or have consented in writing to electronic service, and that service will be accomplished through the CM/ECF system.

March 8, 2023

> */s/ Kenneth H. Brown*
> Kenneth H. Brown
> Jordan A. Kroop
> Cia H. Mackle
> PACHULSKI STANG ZIEHL & JONES LLP
> *Counsel for Appellant*